**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **DAVID AND BARBARA SHEMENSKI** | ) | |
| | ) | **Case No. 03 C 0861** |
| **Plaintiffs,** | ) | **Judge Blanche M. Manning** |
| **v.** | ) | |
| | ) | |
| **Lyons Police Officer SERGEANT** | ) | |
| **MICHAEL CHAPIESKI and JAMES** | ) | |
| **RODGERS and the VILLAGE OF** | ) | |
| **LYONS,** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM AND ORDER**</u>

Plaintiffs David and Barbara Shemenski (collectively, "plaintiffs" or "the Shemenskis")
bring this action against Sergeant Michael Chapieski and James Rodgers, Village of Lyons
police officers (collectively, "the officers"), and the Village of Lyons. Plaintiff David
Shemenski asserts a claim for unreasonable seizure under 42 U.S.C. § 1983 against the officers
and a state law claim for false arrest against Chapieski. The Shemenskis assert state law claims
for intentional infliction of emotional distress ("IIED") against Chapieski, a claim of *respondeat
superior* against the Village of Lyons and a claim for indemnification under 745 ILCS 10/9-102
against the Village of Lyons. Defendants move for summary judgment on plaintiffs' claims of
IIED, false arrest, unreasonable seizure under §1983, indemnification and *respondeat superior*.
For the following reasons, the court denies defendants' motion.

**I.      Facts**

The following facts are undisputed unless indicated otherwise. Officer Mike Chapieski
("Chapieski") has been employed as a Village of Lyons police officer since July 1990 and was

promoted to Sergeant in December 2001. As a sergeant, Chapieski's duties included being in charge of a shift of four people. Officer James Rodgers ("Rodgers") was hired by the Lyons Police Department in October 2000 as a patrol officer and became a detective in November 2003.

Plaintiffs' daughter, Claire Shemenski, was born on June 18, 2002. Claire[1] was diagnosed with Down Syndrome and had a number of other medical issues all associated with her Down Syndrome, including patent ductus arteriosus and atrial septal defect, both of which are holes in the heart. After she was born, Claire was brought home from the hospital when she was one week old.

At approximately 3:20 a.m. on July 2, 2002, after the Shemenskis had fallen asleep with Claire in their bed, Barbara was awakened by David's yelling. David woke up his wife because he had awakened to find Claire in distress and not responding to his shaking and calling her name in an attempt to awaken her. David told Barbara that Claire was not breathing. After calling 911, David began CPR on his daughter. Barbara took over the CPR at some point and David again called 911.

At this time, David was wearing boxer shorts and no shirt. David had been sleeping on the right side of the bed (as you look from the foot of the bed) and plaintiffs contend that there was mucous and blood discharge from Claire's mouth next to him where he had fallen asleep holding Claire. Although defendants dispute that the testimony supports the contention that there was discharge on the side that David was sleeping on, David did testify that there was

---

[1]The court will refer to David and Barbara Shemenski and their daughter, Claire, by their first names.

"discharge" from the baby's mouth next to where he had "fallen asleep holding her," but he could not recall on which side.

At the time this was happening, Chapieski was at the Village of Lyons police station working as a shift commander. Chapieski was told that the station had received a call involving a baby not breathing at the Shemenski's home address. Chapieski drove to the Shemenski's home and arrived just as the ambulance was pulling up to the home. He was the first officer on the scene. Rodgers and an Officer Formato ("Formato") were also dispatched to the Shemenski's home. Rodgers was the last officer on the scene.

After he had called 911 the second time, David noticed lights coming down the street so he ran outside. Although David cannot recall whether it was both paramedics and police officers, he met up with one or more people who followed him up to the master bedroom where Barbara and Claire were located. It was a hot morning and the bedroom windows were open and the overhead fan was on. At the time of the incident, the only air conditioning in the house was a window unit located on the first floor of the house.

Chapieski ran upstairs to the master bedroom with one of the paramedics.[2] When he went into the bedroom, Barbara was performing CPR on Claire on the left side of the bed. The paramedic immediately went into action, checked Claire's vital signs and asked Barbara if Claire had any problems. The paramedic was told that Claire had Down Syndrome. Chapieski did not ask the paramedic any questions at this time about Claire's condition. The paramedic picked up Claire, said he was taking her to MacNeal Hospital, and ran to the ambulance. David put on a

---

[2]Plaintiffs state in their Local Rule 56(b)(3)(B) Statement of Additional Facts that more than one paramedic came into the house. The court does not consider this a material issue of fact.

3

shirt, Barbara put on shorts and they, along with Chapieski, followed the paramedic out to the ambulance and watched as the paramedics worked to resuscitate Claire in the back of the ambulance.

During that time, Chapieski noticed that the paramedics were trying to clear Claire's mouth and that there was blood and mucus coming out of her mouth. There were no cuts or bruises on Claire. Further, in response to a question at his deposition that "[t]he only thing you saw on the baby that was indicative of any physical damage was the blood and mucous that was around the mouth, is that correct?," Chapieski answered "Yes, sir." While standing by the ambulance with the Shemenskis, Chapieski had no conversation with them about Claire's condition. Nor did he hear the paramedics say anything which indicated that Claire had been the victim of intentional abuse or violence. Chapieski knew the situation was serious and even thought that Claire might be dead. Chapieski has been involved in quite a few investigations where there had been blood and mucous coming out of a person's airway.

The only comment that Barbara recalls hearing before she went outside to the ambulance either from the paramedics or the police officers was that the paramedics were going to take the baby to the ambulance to MacNeal Hospital. She did not recall overhearing anyone saying anything to David before she went outside to the ambulance.

While standing by the ambulance, David and Barbara noticed that one of their other four children was looking out the window; accordingly, David went back inside to comfort his daughter who had awakened. At that time, David noticed two police officers, Rodgers and Formato, standing at the top of the stairs.

At the time the paramedics were rushing the baby to the back of the ambulance, Rodgers

had arrived on the scene and had gone directly to the master bedroom. Rodgers observed the following: the blankets on the bed were pulled back; two stains of unknown origin were on the bed; and open beer bottles were located in the room. According to plaintiffs, some of the bottles were being used as ashtrays. Neither Barbara nor David had drunk any alcohol that night and Chapieski did not smell alcohol on them. Rodgers also noticed the room was very hot.

When David returned to the house, Barbara remained by the ambulance. Although Barbara had asked to ride in the ambulance to the hospital, she was told she could not but could follow in her car. Barbara got into her minivan, started it and waited for the ambulance to leave. As the ambulance started to pull away, Barbara began following it, but just as she did so, Chapieski approached her and told her to follow the ambulance to the hospital. She did not respond and then proceeded to follow the ambulance to the hospital. This exchange was the only time that Barbara actually spoke with Chapieski that day.

At some point after making his initial observations, Rodgers started talking to David. Rodgers asked David for his personal information and also questions designed to determine what happened. The parties disagree as to what was said at this point.

Defendants assert that David told Rodgers that he had fallen asleep with the baby and when he woke up, he found the baby unresponsive. David then told Rodgers that David woke his wife who started to give the baby CPR while he called the police department. Defendants state it was at this point that Rodgers, in an effort to reconstruct the events, asked David where the baby was when David woke up.

In contrast, David testified that the first discussion he had with Rodgers was about where he had fallen asleep holding Claire, and what position he was in when she was in his arms.

According to David, he told Rodgers that he had been holding Claire after his wife fed her, that he laid her down, she was fussy, that he picked her back up so that she could sleep over his shoulder and he then fell asleep holding her. David could not remember which crook of his arm Claire's head had been resting in. He questioned whether it was one side, but commented that the stains from fluid from Claire's mouth and nose were pooled at an area where he had been sitting, so her head must have been there, but he did not recall for certain. David then told Rodgers that Claire was two weeks old, had Down Syndrome, and had problems with her heart and liver. Formato was also present at this conversation and concluded that nothing David had said indicated that he had violated any law.

Although David disputes these conclusions in an affidavit made out subsequent to his deposition,[3] Rodgers testified at his deposition that David did not answer Rodgers' questions directly and was hesitant to respond. Rodgers also testified that as he was trying to reconstruct the events, David kept pausing for five to ten seconds before giving any answers.[4] Rodgers also testified that David told him four or five places where he thought the baby was located when he fell asleep and where the baby was when he woke up. According to Rodgers, David also kept re-emphasizing the baby's feeding schedule and was calm, not noticeably upset and did not inquire

---

[3]A party may not submit affidavits that contradict earlier deposition testimony. *Beckel v. Wal-Mart Associates, Inc*., 301 F.3d 621, 622 (7th Cir.2002) (affidavits "offered to contradict the affiant's deposition are so lacking in credibility as to be entitled to zero weight in summary judgment proceedings unless the affiant gives a plausible explanation for the discrepancy"). Here, however, David's affidavit does not appear to contradict his own testimony; rather, it responds to statements made by defendants in their motion for summary judgment that were not addressed in his deposition.

[4]David does not dispute there may have been pauses but denies they were five to ten seconds long.

about his baby's status or whereabouts during the conversation.

The parties agree that at several points during the conversation, David spontaneously mentioned that the baby had Down Syndrome. Rodgers interpreted David's comments about the feeding schedule and the Down Syndrome to have been made in a complaining manner. During the conversation, Rodgers noticed that David did not have any stains on his shirt or hands, which he testified he found odd given that there were stains on the bed and David said he had been holding the baby. David remained calm throughout his conversations with Rodgers and Formato and engaged in small talk with the officers, which David testified was to allay any fears of his older daughter who had woken up.

After Barbara went to the hospital, Chapieski went back inside and as he was walking into the bedroom, Chapieski noticed that Rodgers and Formato were speaking to David. Chapieski heard David and the officers talking about the awards the officers had received and Chapieski walked into the bedroom to look around. Chapieski observed that near a pillow on the bed there was a wet spot that appeared to be blood and mucous and he also saw some blood spots that were located at the foot of the right side of the bed. Chapieski also noticed a number of open beer bottles on the night stand to the right of the bed, and that the room was very warm.

Chapieski claims that at this time, Rodgers and Formato approached him in the bedroom and told him that they had concerns. Formato denies, however, that he was part of any such conversation and Rodgers claims that any such conversation took place outside the house. Chapieski claims that during this conversation, Rodgers told him that they asked David "what the stains were" and that he "replied he did not know what those were doing there." Chapieski also testified that Rodgers told him that David asked him if this was a SIDS case, and that

Rodgers told him that David was calm and that David appeared to have an indifferent attitude. Chapieski also stated that Rodgers told him that David was asking about Rodgers' sharpshooting awards. Chapieski also stated that Rodgers told him that they asked David what shirt he had been wearing to bed and that he pointed to one on the floor that had no stains on it. David contends that he was not wearing a shirt to bed and never told the officers that he was. Chapieski testified that during this conversation, they discussed their concerns, including the location of blood and mucous on the bed, the warmth of the room, the indifference exhibited by David, and the fact that there were no stains on David's shirt even though he said he had fallen asleep with the baby on him.

Chapieski then left the house and called the police station to ask that a detective and an evidence technician be called to the scene. Shortly thereafter, Inspector Vizek called Chapieski back and Chapieski explained his concerns to Vizek. According to Chapieski, Vizek told him to keep the mother and father separated and said that he was coming to the scene. Chapieski stated that Vizek further told him to get David to the police station "to the best of [his] ability" but did not instruct Chapieski to arrest David. Vizek, however, testified in his deposition that he did not tell Chapieski not to let David go to the hospital.

At this time, Chapieski believed that a possible homicide had been committed and Rodgers felt that a possible crime of neglect or endangerment had occurred. At the time of this incident, Chapieski was aware of a 1994 case in which a baby was found dead in a bassinet, which death was later determined to have been the result of a cocaine overdose. According to Chapieski, the 1994 death remains an unsolved homicide caused in part by a poor investigation by the Lyons police department because they did not get statements from the parents before the

autopsy.

A babysitter eventually arrived at the house and when she did, David asked one of the officers to move the police car that was blocking the driveway. The officer told him to go speak with Chapieski. David went outside and asked Chapieski to move the car and Chapieski responded that David would have to wait a few minutes. David came back outside a few minutes later and asked Chapieski again to move the car and Chapieski told him that there were protocols that needed to be followed and David would have to wait.

David returned to his house with the intention of calling the Lyons Police Department to get the car moved, but before he did so, the babysitter told him to take her car. Rodgers saw the babysitter give her keys to David and so Rogers radioed Chapieski to relay this information to him. David and Rodgers then both went outside. David started to walk to the babysitter's car and Chapieski asked him where he thought he was going in a "loud" and "authoritative" tone of voice. David told him he was going to the hospital and Chapieski responded that David needed to come to the police station to talk with investigators. David then walked back toward Chapieski and Chapieski told David that he would need to be handcuffed.

David asked why he was being handcuffed and asked if he was under arrest. David was told that it was procedure and that he was not under arrest but that he would have to be handcuffed. Chapieski testified at his deposition that, in fact, David was under arrest and was not free to go, but had not been formally charged. Chapieski testified that he told David he was not under arrest to keep the situation "calm." At the time of the arrest, Chapieski had not consulted with any medical or other personnel to determine whether the blood or mucous on Claire's mouth was evidence that a crime had been committed. At the time of the arrest,

Chapieski did not know that Claire was dead but had a "reasonable belief" that she was dead. Chapieski testified that he was arresting David for investigation of a homicide and investigation of aggravated battery. Chapieski did not contact a state's attorney prior to arresting David to determine if probable cause existed for the arrest.

Chapieski told Rodgers to handcuff David, take him to the police station, and put him in the south room. Rodgers handcuffed David, put him in the back of the squad car and drove to the police station. Upon reaching the station, Rodgers took David to the south room, uncuffed him, conducted a pat-down search, removed his cell phone, car keys, cigarettes, and lighter, asked him if he needed anything and then closed the door. Rodgers locked the door, which was departmental policy when a person was arrested. Rodgers testified that the door was locked for safety reasons because it is not a secured door and if it is not locked, a person inside the room can get access to the dispatcher. Rodgers had no more contact with David that day. The parties agree that Rodgers treated David compassionately.

When Rodgers left the room, he asked the dispatcher to keep an eye on David. Rodgers then left the station and came upon Chapieski and Detective Vizek, whereupon he was directed to go to the hospital to bring Barbara back to the police station

After Rodgers left and locked the door to the room where David was, David became alarmed and started yelling and screaming, saying "you can't do this to me," "this isn't the Soviet Union," and "I want to see my wife and child." When no one responded, David hit the buzzer several times. A voice asked him what he wanted and he stated that he wanted to go to the hospital to see his wife and child. Following that exchange, Chapieski opened the door and stepped partly into the room. Chapieski then said, "I'm sorry to inform you, but your daughter

has already passed on" and then closed the door. David testified that Chapieski made the statement about David's daughter in a "cruel" tone of voice. David then became very agitated, screamed, and kicked the desk and demanded to be let out of the room, saying "my wife needs me, I want to see my daughter, I want to go to the hospital, you're not allowed to do this to me." David also started yelling that they needed to get a priest to the hospital because his daughter had not yet been baptized. After David had pressed the buzzer repeatedly, a female voice came on and said, "would you please stop that, it's annoying. Just sit down and relax 'til someone gets there." The Lyons Police Department videotaped David and the tape showed that David was hysterical. The Lyons Police Department destroyed the videotape.[5]

Sometime later, Detective Vizek came into the room and interviewed David. They had a brief conversation that lasted about ten minutes. In the meantime, Rodgers proceeded to the hospital and when he arrived, he told Barbara he would take her back to the police station whenever she was ready. When Barbara asked Rodgers where her husband was, he told her he was at the police station. Before Rodgers arrived at the hospital, but while Barbara was at the hospital, she did not have any conversations with anyone regarding the police department or any police officers. In between the time that she left for the hospital and the time that Rodgers arrived at the hospital, Barbara stated that she expected David to come to the hospital and numerous hospital staff asked where he was. She stated in response to their inquiries that she did not know where he was but that she was expecting him.

After Rodgers had arrived at the hospital and some time had passed, Barbara got into

---

[5]Neither the parties briefs nor their statements of facts provide any additional details regarding the destruction of the videotape.

Rodgers' car and he drove her back to the police station. When they got to the station, Rodgers took her down to the squad room and interviewed her. After a few minutes, Detective Montes came into the room and interviewed her. Barbara did not see Rodgers again. The parties agree that all of Barbara's dealings with Rodgers were polite and compassionate. After Detective Montes finished interviewing Barbara, Montes drove David and Barbara back to the hospital. During that ride, Barbara heard for the first time about David's experience.

Dr. Ronald Knoblock of the Cook County Medical Examiner's office determined that there was nothing about Claire's death that was in any manner suspicious, that the manner of the death was natural, and that the cause of death was a heart disorder with atrial septal defect and patent ductus arteriosus, along with a liver abnormality.

After Claire's death, David received counseling and treatment from two different professionals. He had not received counseling prior to Claire's death. David also began attending two different SIDS support groups three months after his daughter's death. In addition, since his daughter's death, David began treatment with several different antidepressants, which he did not take prior to this incident. One of David's treating physicians, Dr. Rest, diagnosed David with a major depressive disorder with post-traumatic stress disorder. The traumatic event which caused the PTSD was Claire's death and the events surrounding her death, including the arrest and detention of David by the police.

During the course of his counseling, David has expressed great anger about the behavior of the police, and has reported feelings of loss of control, anxiety, repetitive dreams, heightened arousal around flashing lights and emergency vehicles, perceptions that the event is reoccurring, intrusive recollections, numbing of responses, diminished enjoyment of activities, including

personal relationships, occupation and recreational activities, and hypervigilance.

In addition, since the incident, David has had dreams which are like videotape replays of the events.  In other dreams, David's wife or one of his children is in danger and the police will not let him near them.  He had experienced one or two of these dreams in the three months prior to his deposition.  As a result of these dreams, he has had trouble falling asleep and does not want to go to sleep.  David also has a fear of police cars.  For example, when he sees them, he will take a different route to see if he is being followed or if he is in a store parking lot, he will wait until the police car leaves before going in the store.  David also testified that if he is "stopped for any reason," he becomes "filled with this sense of what's going to happen.  What will they do this time?  Where will I go this time?  Are they going to take me away this time?"

David also testified that he believed that the incident has affected his job because he fears his supervisors are  going to fire him for no reason and so he leaves his job for hours at a time to avoid the fear.  David also focuses on his incarceration frequently–almost once a day.  David also has "violent revenge fantasies" in which he sees an automobile crash.  When David goes to the scene, he sees Chapieski bleeding to death and asking for David to get help and David says no and watches Chapieski die.  David also has displayed an urge to harm himself and has cut himself with pens or paper clips about once a month.  David also has attended church on only one or two occasions since the incident and uses work as a release or therapy for the incident.

Dr. Rest also diagnosed Barbara with a major depressive disorder with post-traumatic stress disorder, which, he testified, was precipitated by the death of Claire and the separation from David at the time of the death.

Detective Kuratko of the Lyons Police Department conducted an investigation into

David's arrest and detention.[6]  Based upon what Chapieski told Kuratko in the early morning phone call on the morning of July 2, 2002 and the interview with Chapieski during his next shift on July 2, 2002, Kuratko determined that there was not enough information to supply probable cause.  During his conversation with Kuratko on his next shift on July 2, 2002, Chapieski did not acknowledge that he had arrested David.  Based on his investigation, Kuratko also determined that David's detention on July 2, 2002 was unlawful.

## II.     Standard

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Carrett*, 477 U.S. 317, 322-23 (1986).  A genuine issue of material fact exists for trial when, in viewing the record and all reasonable inferences in a light most favorable to the non-moving party, a reasonable jury could return a verdict for the non-movant.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Under Rule 56, the initial burden is on the moving party to show that there are no genuine issues of material fact.  *See Celotex*, 477 U.S. at 323.  Because the primary purpose of a

_____

[6]In their Rule 56(b)(3)(B) Statement of Material Fact, plaintiffs cite to many "facts" based on the testimony of Frank Laverty.  Mr. Laverty is a retired Chicago Police Department homicide detective and attorney who was hired as an expert witness by plaintiffs.  Defendants move to strike his testimony on various grounds, including that Laverty testified that probable cause requires a higher standard than "more likely than not" which defendants contend is incorrect, Laverty's testimony improperly consists of opinions and legal conclusions rather than fact, Laverty's testimony is irrelevant, lacks the proper foundation, and is based on hearsay and speculation, and Laverty has failed to properly characterize the evidence in this case.  However, because Laverty's testimony is not necessary to the resolution of this motion, the court need not address defendants' motion to strike at this time.

summary judgment motion is to dispose of claims that have no factual support, the non-movant must respond with definite, competent evidence to rebut the summary judgment motion. *See id.* at 322-23; *Vukadinovich v. Board of Sch. Trustees,* 278 F.3d 693, 698-99 (7th Cir. 2002).

## III.      Intentional Infliction of Emotional Distress

Both plaintiffs allege intentional infliction of intentional distress claims against Chapieski. Specifically, they state that Chapieski falsely arrested David, handcuffed him and caused him to be taken to the police station and locked up, and refused to allow him to go to the hospital to be with his wife and daughter while knowing that his infant daughter was in critical condition. In further support of this claim, Plaintiffs allege that Chapieski "brutally" told David of Claire's death and even after Chapieski knew of Claire's death, he still refused to release David and denied David and Barbara their mutual comfort and support knowing that David had not committed any offense.

In order to be successful on a claim of intentional infliction of emotional distress, the plaintiff must show that (1) the defendant's conduct was extreme and outrageous; (2) the defendant must have intended that his conduct inflict severe emotional distress or know with a high degree of certainty that the distress would result; and (3) the conduct must in fact cause severe distress. *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001) (citing *McGrath v, Fahey*, 126 Ill. 2d 78, 86 (1988)). In determining whether conduct may properly be characterized as "outrageous," the court employs an objective standard based on the facts of each case. *Doe v. Calumet City*, 161 Ill. 2d 374, 392 (1994). The tort does not arise from threats, insults, indignities, annoyances or petty oppressions. *McGrath*, 126 Ill.2d at 86 (citing *Restatement (Second) of Torts* § 46, comment d, at 73 (1965)). Liability only attaches when the defendant's

conduct goes "beyond all possible bounds of decency, as to be regarded as intolerable in a civilized community." *Kolegas v. Heftel Broad. Co.*, 154 Ill.2d 1, 21 (1992). Further, "[t]he distress inflicted must be so severe that no reasonable person could be expected to endure it." *Thomas v. Fuerst*, 803 N.E.2d 619, 625 (1st Dist. 2004) (internal citations omitted). Finally, for purposes of determining whether there has been an intentional infliction of emotional distress, the intensity and duration are factors to be considered. *Adams v. Sussman and Hertzberg, Ltd.*, 684 N.E.2d 935, 942 (Ill. App. Ct. 1997).

Defendants contend that neither Barbara nor David can maintain a claim for intentional infliction of emotional distress. As to Barbara, defendants refer to this court's previous order on defendant's Rule 12(b)(6) motion to dismiss in which the court held that since Barbara's claim of IIED was based on the conduct toward her husband, her claim must be analyzed under the Restatement's third-party framework. *Shemenski v. Chapieski*, No. 03 C 00861, 2003 WL 21799941, at *3 (N.D. Ill. July 30, 2003). Under that framework, "liability may extend beyond the natural plaintiff when the defendant intentionally or recklessly causes severe emotional distress '(a) to a member of [the direct victim's] immediate family who is present at the time, whether or not such distress results in bodily harm, or (b) to any other person who is present at the time, if such distress results in bodily harm.'"[7] *Shemenski,* No. 03 C 00861, 2003 WL 21799941, at *2 (quoting *Green v. Chicago Tribune*, 675 N.E.2d 249 (Ill. App. Ct. 1996) (*citing Restatement (Second) of Torts* §46(2), at 72 (1965)).

In that same order, the court concluded that to the extent that Barbara was seeking to

---

[7]No one argues that Barbara suffered bodily harm, thus any claim under § 46(2)(b) is foreclosed. *See Shemenski,* No. 03 C 00861, 2004 WL 21799941, at *3.

recover *directly* for intentional infliction of emotional distress, such a claim must fail. *Id.*

("Mrs. Shemenski's attempt to shed her third-party label and cloak herself as a direct victim, and

thereby evade the requirements of §46(2), goes nowhere."). The court noted that Chapieski did

not have any direct contact with Barbara, and that her interactions with the Village of Lyons

police department were "minimal and unremarkable." *Id.* The court further held that to the

extent that Chapieski knew that detaining David would distress Barbara, "this fact only supports

a necessary element of her third-party claim. . . [i]t does not transform Mrs. Shemenski into a

direct victim; to hold otherwise would completely undermine the 'presence' and 'immediate

family' requirements of §46(2)." *Id.*

Despite this court's previous ruling, however, Barbara states in her response to the

motion for summary judgment that "[i]t is thus clear that defendants committed a separate wrong

against Barbara, and that she is not seeking to recover as a third party for the arrest of David, but

as a plaintiff who was *directly wronged by the acts of plaintiff*." Specifically, Barbara contends

that "it is the fact that she was deprived of David's presence that is the actionable act." Barbara

cites to several Illinois cases in support of her contention that she is entitled to pursue a claim of

IIED directly rather than as a third party. The court interprets Barbara's argument in her

response as a motion to reconsider the court's ruling that Barabra is not entitled to bring a direct

claim for IIED. Based on further consideration, the court concludes that Barbara may bring a

direct claim for IIED based on actions directed at her.

This is so despite the fact that the bulk of authority cited by Barbara involves situations

where the plaintiff was "claiming damages as a result of conduct which was directed specifically

at the plaintiff–not for conduct directed at a third-party which affected the plaintiff." For

example, in *Gragg v. Calandra,* 696 N.E.2d 1282,1290 (Ill. App. Ct. 1998), plaintiff and her

mother had taken their father/husband into the hospital for treatment of heart problems. During a

procedure, the patient sustained irreversible brain damage and the plaintiff and her mother asked

that he be taken off of life support pursuant to his living will, but the hospital refused. Plaintiff

alleged a claim of IIED based on the fact that defendants had verbally abused her and her mother

by accusing them in public of trying to kill her father, among other things. The Illinois

Appellate Court reversed the dismissal of the IIED claim because "considering the emotional

state of plaintiff and her mother and that defendants knew or should have known of their

emotional state, defendant's actions of accusing plaintiff and her mother of trying to kill [the

patient] could be considered so mortifying and callous as to amount to outrageous conduct."

*Gragg,* 696 N.E.2d at 1290. Thus, the alleged outrageous conduct was directed at the plaintiff.


In *Amato v. Greenquist*, 679 N.E.2d 446, 455 (Ill. App. Ct. 1997), plaintiff received

counseling from a pastor who was having an affair with plaintiff's wife. The court concluded

that plaintiff had stated a claim for the conduct directed at him by the pastor from whom he had

received counseling. *Id.* ("defendant allegedly used his position to learn confidential

information, which he divulged to [the wife] in an effort to destroy the plaintiff's marriage.").

Thus, the conduct was directed at plaintiff.

In *Kolegas*, plaintiffs (a husband, wife and child) alleged IIED claims based on

comments made by radio disc jockeys on the air. Specifically, the husband, a promoter of classic

cartoon festivals, was being interviewed on the air regarding an upcoming festival, and told the

disc jockeys that part of the proceeds were going to benefit neurofibromatosis, or Elephant

Man's disease.   The husband indicated that both his wife and son suffered from the disease at which point the disc jockeys hung up on the husband, stated that he was scamming them, and asked "Why would someone marry a woman if she had Elephant Man disease?"  *Id*. at 205. Defendants also allegedly stated that it must have been a shotgun wedding and that the husband must have had to spend his time picking out his family's wardrobe "to make sure they have large hats to cover their heads."  *Id*.  The court found that these derogatory comments, broadcast throughout the Chicagoland area, sufficiently alleged extreme and outrageous behavior.  Again, the alleged conduct was directed at all of the plaintiffs, albeit on the radiowaves, but nevertheless, plaintiffs were the specific recipients of the defendants' conduct.

Finally, in *Green*, plaintiff alleged that the defendant-newspaper had taken unauthorized photos of her dead son in the hospital, prevented her from entering the room when they were taking the photos and then listened to (and published) the statements she made to her dead son after she refused to make a statement regarding her son's death.  *Green*, 675 N.E.2d at 251.  The Illinois Appellate Court held that "plaintiff stated a cause of action for intentional infliction of emotional distress caused by the Tribune when it barred her from seeing her dead son on December 31 while it photographed him, and when it published the January 1 article featuring her statements to her son and the photograph of him lying dead."  *Id.* at 257.  Again, the conduct as to which the plaintiff was allowed to proceed as to her IIED claim was directed specifically at her.  Notably, the court held that plaintiff could *not* state third-party claims for IIED for an article on her sons' death  in which she was not mentioned or for the newspaper photographing her son's medical treatment when she was not present.  *Id.* at 258.

Despite Barbara's contention, these four cases described above do not support her

argument that she should be allowed to pursue an IIED claim for conduct that was not directed specifically at her.

Barbara's contention that she can assert a direct claim for IIED, however, fares better with the final case she cites, *Rekosh v. Parks*, 735 N.E.2d 765 (Ill. App. Ct. 2000). In *Rekosh*, decedent's adult sons sued their father's ex-wife and a funeral home alleging IIED. Specifically, plaintiffs alleged that after their father's death, the ex-wife met with agents of the funeral home, falsely stated that she was the decedent's spouse, and asked to have his remains cremated and given to her. The funeral home performed the cremation and gave the ashes to the ex-wife (who dumped them in her backyard without notifying plaintiffs) despite not receiving a proper cremation authorization form. According to the allegations, the funeral home became aware that the ex-wife was not the decedent's current spouse and "witnessed" the signature of one of the sons on the authorization form even though the son was not there.

On defendants' motion to dismiss for failure to state a claim, the *Rekosh* court concluded that plaintiffs had stated a claim against both the ex-wife and the funeral home for IIED. *Id.* at 772 ("We believe that a reasonable person who enjoyed a warm, affectionate, and natural relationship with a parent would resent someone who, upon that parent's death, by means of a forgery, illegally cremated the body and disposed of the remains in a backyard without his knowledge or consent."). As to the funeral home, the court stated that "[a] funeral home's facilitation of a cremation that is not legally authorized, knowing that there are next of kin who are potentially unaware of the death or the arrangements and perhaps have objections, may reasonably be regarded" as outrageous conduct. *Id.* at 773. The court also found that plaintiffs had sufficiently pleaded intent as to the ex-wife and the funeral home. *Id.*

The court finds the facts of *Rekosh* similar to the facts of the instant case. In *Rekosh*, plaintiffs were held to have stated an IIED claim against the ex-wife and funeral home for conduct that was not directed specifically at plaintiffs. Indeed, plaintiffs were not even aware at the time that the defendants had entered into the conduct. In the instant case, Chapieski was aware that Barbara was at the hospital with the Shemenski's very sick infant. While *Rekosh* addressed only whether plaintiffs had stated a claim for IIED, and this case is in the summary judgment posture, it appears that Illinois will, in certain circumstances, permit a direct claim for IIED to an individual such as Barbara who was a secondary recipient of the alleged outrageous conduct. *See also Burgess v. Taylor,* 44 S.W.3d 806, 811 (Ky. Ct. App. 2001) (concluding that a jury verdict for plaintiff for IIED claim was supported by evidence where defendant, who had been given plaintiff's horses to care for, sold the horses to a slaughterer and then lied to plaintiff about it); *O'Cain v. Harvey Freeman and Sons, Inc*., 603 So. 2d 824, 830 (Miss. 1991) (rejecting plaintiff's emotional distress claim based on bystander liability when roommate was sexually assaulted in apartment with plaintiff present because plaintiff did not witness the assault, but allowing plaintiff to proceed on direct claim of IIED). Assuming then, that Illinois would permit Barbara to pursue a direct claim for IIED, the court turns to whether defendants have shown that they are entitled to judgment as a matter of law on Barbara's IIED claim.[8]

As noted above, Barbara Shemenski must show that: (1) the defendant's conduct was extreme and outrageous; (2) the defendant must have intended that his conduct inflict severe

---

[8]The parties have not addressed whether Barbara has satisfied the elements of an IIED claim. The defendants' motion for summary judgment on this count was based solely on their contention that Barbara Shemenski cannot bring such a claim either directly or as a third party. The court, then, will consider whether defendants are entitled to judgment as a matter of law as to the IIED claim using the evidence presented in the parties' Local Rule 56 statements of fact.

emotional distress or known with a high degree of certainty that the distress would result; and (3) the conduct must in fact cause severe distress. *Honaker,* 256 F.3d at 490 (citation omitted).

Chapieski's alleged outrageous conduct as it relates to Barbara is that he arrested David and prevented him from going to the hospital knowing that Barbara was expecting him to join her and preventing Barbara from enjoying the "presence and comfort of her spouse" when their daughter was critically ill. The court finds that a jury could conclude that Barbara would greatly resent having her husband's presence withheld from her when she was at the hospital while her critically ill daughter was being treated and then, when being told that her daughter was dead.[9]

Further, Chapieski clearly could have known with a high degree of certainty that by detaining David he was also depriving his wife of her husband's presence during a critical time. Chapieski was the first officer to arrive at the Shemenski's home after the 911 call, saw that Claire was in a dire medical emergency and indeed, even believed her to be dead, and was the last person to speak with Barbara before she left for the hospital. A jury could find that Chapieski could have known with a high degree of certainty that not having David with her at the hospital as she awaited news of Claire's condition and then after finding out that Claire was dead would be quite distressing to Barbara.

Finally, as to the emotional distress prong, Barbara's doctor testified that he diagnosed Barbara with a major depressive disorder with post traumatic stress disorder precipitated by

---

[9]Conduct is of an extreme and outrageous character where "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994) (citing Restatement (Second) of Torts § 46, Comment d, at 73 (1965)), *overruled on other grounds*, *In re Chicago Flood Litigation*, 680 N.E.2d 265 (Ill. 1997).

Claire's death and David's absence at the hospital.  Further, Barbara responded to interrogatories that she experienced nightmares and flashbacks of seeing Claire's lifeless body, being told that Claire was dead and having to hold her dead body all without the presence of her husband.  She also stated in her interrogatory answers that she has suffered from flashbacks of the feeling of dread she had that day and feels that DCFS is coming back to take away her children and David.  She also stated that she has lost sleep over the events surrounding Claire's death and that she is "unable to think about Claire or mourn her death without those awful memories of being alone."[10]   Based on these facts, the court finds that a jury could reasonably conclude that Barbara suffered severe emotional distress as a result of David's absence.  Accordingly, defendants' motion for summary judgment as to Barbara's IIED claim is denied.

The court now turns to defendants' argument that David cannot recover for IIED as a matter of law.  Plaintiffs do not substantively respond other than to say that the matter should be presented to a jury.  For the following reasons, this court denies defendant's motion for summary judgment as to David's claim of IIED.

Defendants cite to *Khan v. American Airlines*, 639 N.E.2d 210 (Ill. App. Ct. 1994), *abrogation on other grounds recognized by Velez v. Avis Rent A Car System, Inc.*, 721 N.E.2d 652 (Ill. App. Ct. 1999), in support of their argument that David has not shown that Chapieski's

---

[10]Defendants have moved to strike the paragraph of plaintiff's statement of additional facts that contains Barbara's interrogatory answers regarding her feelings about the incident at issue.  Defendants contend that it "cites a legal conclusion" when it states that Barbara suffered "extreme mental distress" and deny that she suffered extreme emotional distress as defined under Illinois law.  To the extent that the statement includes a legal conclusion, it will be disregarded by the court.  However, the paragraph also contains written testimony as to Barbara's feelings, which defendants deny without citing to contradictory evidence in the record.   Accordingly, the factual description of Barbara's feelings is deemed admitted.

conduct was sufficiently extreme and outrageous or that David's distress was sufficiently severe. In *Khan*, airline security officers had an airline ticket they believed to be stolen. The officers delivered the ticket to Khan "with the intent to entrap him and without facts to indicate that Khan knew the ticket was stolen." *Id*. at 211. After making the delivery, the security officers arrested Kahn, had him taken into custody by the police, fingerprinted and photographed even though no factual basis existed for the arrest. Plaintiff asserted a claim for intentional infliction of emotional distress stating that the conduct of the security officers was severe because when they took him into custody, they learned that he was on his way to his father's funeral; thus, the officers knew of his increased level of sensitivity at the time. Plaintiff claimed that as a result of the arrest, he had trouble sleeping, did not speak about the incident with his wife and had recurring nightmares about the arrest and the fact that he did not attend his father's funeral. *Id*. at 215.

The Illinois Appellate Court held, however, that plaintiff had failed to plead facts to support a claim for IIED. *Id.* at 215 (concluding that defendant's conduct did not go "beyond all possible bounds of decency, that the distress the plaintiff suffered as a result of the conduct was such that no reasonable person could be expected to endure it or that there was a high degree of probability that severe emotional distress would follow the conduct of the defendants and that the defendant went ahead in conscious disregard of that probability").

The court, however, finds that the factual situation in *Khan* is distinguishable. In *Khan*, plaintiff's father had already passed away and plaintiff was *en route* to his funeral. Here, however, David awoke in the middle of the night to find his two-week-old daughter not breathing. After administering CPR and speaking with the officers at the scene, David, while

attempting to leave for the hospital, was handcuffed and told that, although not under arrest, he needed to go to the police station for questioning. At the police department, his personal items were taken from him and he was placed alone in a locked room. When he became agitated and asked to be let out so that he could go to his wife and daughter, he was told in an abrupt manner that his daughter had died. David was then kept locked in a room and still was not allowed immediately to leave to go to the hospital to be with his wife and child. The facts show that David became extremely agitated and upset and was extremely anxious to get to the hospital so that his daughter could be baptized by a priest.

Also, in *Khan*, plaintiff alleged that he had trouble sleeping, had nightmares, and could not speak to his wife about the incident. In the instant case, David Shemenski's emotional distress is more serious. After the incident, David expressed great anger about the behavior of the police, and has reported feelings of loss of control, anxiety, repetitive dreams, heightened arousal around flashing lights and emergency vehicles, perceptions that the event is reocurring, intrusive recollections, numbing of responses, and diminished enjoyment of activities. He also was diagnosed with post-traumatic stress disorder, started taking antidepressants, and attended support groups for parents whose children have died of SIDS. The court concludes that based on the above facts, a jury could find Chapieski liable for a claim of intentional infliction of emotional distress as to David.

The court's conclusion is supported by two factors that the Illinois courts have identified as bearing on the analysis of whether defendant's conduct may be deemed outrageous. First, "the extreme and outrageous nature of the conduct may arise from the defendant's abuse of some position which gives him actual or apparent authority over the plaintiff or the power to affect the

plaintiff's interests." *Kolegas*, 607 N.E.2d at 211. Here, Chapieski, as a police officer, had an obvious position of power over David. Pointing to *Rudis v. National College of Educ*., 548 N.E.2d 474, 478 (Ill. App. Ct. 1989), defendants contend that simply because a "comment is made from a position of actual or apparent authority over David Shemenski is not enough to transform what amounted '. . . to no more than insults or indignities into extreme and outrageous conduct.'"

*Rudis*, however, is inapposite. In *Rudis*, the plaintiff, a student, was accused of being a computer hacker, a cheat, and "'not getting what she deserved.'" *Id.* at 476. The court rejected plaintiff's argument that the extreme and outrageous conduct of the defendants resulted from the defendants' position of power and authority over plaintiff because "Rudis has not alleged that the defendants used their positions as school administrators to coerce her into doing something she would not otherwise do." *Id.* Here, however, Chapieski used his authority as a police officer to keep David locked in a room while he knew David's daughter was very sick, and later dead.

Another factor to be considered is "the defendant's awareness that the plaintiff is particularly susceptible to emotional distress, because of some physical or mental condition or peculiarity." *Kolegas,* 607 N.E.2d at 211. Again, Chapieski was clearly aware that David had a fragile mental and emotional state given that Chapieski was on the scene at the Shemenski's house after the 911 call and had told David that his daughter had died. Further, Chapieski was present at or near the interrogation room where David was being held and was aware of David's aggressive and destructive behavior in seeking to be released.

Accordingly, Defendant's motion for summary judgment on David's IIED claim is denied.

**IV.    Unreasonable Seizure Pursuant to 42 U.S.C. §1983 And False Arrest Claims**

Plaintiffs allege that Chapieski and Rodgers lacked probable cause to arrest David, thus leading to an unreasonable seizure under the fourth amendment.  Defendants argue, however, that as a matter of law, the undisputed facts demonstrate that the officers had probable cause to suspect possible homicide, concealment of a homicide, child endangerment, child neglect, or battery.  Because genuine issues of material fact exist as to whether probable cause existed at the time of David's arrest, the court denies defendant's motion for summary judgment as to the §1983 claim of unreasonable seizure.

Probable cause to arrest a suspect exists "if at the time of arrest the facts and circumstances within the arresting officer's knowledge and of which [he] has reasonably trustworthy information would warrant a prudent person in believing that the suspect had committed or was committing an offense." *Gower v. Vercler*, 377 F.3d 661 at 668 (7th Cir. 2004), quoting *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). "Probable cause demands even less than probability; it requires more than bare suspicion but need not be based on evidence sufficient to support a conviction nor even a showing that the officer's belief is more likely true than false."  *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000)(internal quotations and citations omitted). This is necessarily a fact-intensive inquiry.  *Jones by Jones v. Webb*, 45 F.3d 178, 180 (7th Cir. 1995). As a consequence, summary judgment is inappropriate where material facts regarding the existence of probable cause are in dispute.  *See Morfin v. City of Chicago*, 349 F.3d 989, 1000 (7th Cir. 2003)("Where there is a genuine issue of material fact surrounding the question of plaintiff's conduct, the court cannot determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated

established law.") (citation omitted).  *See also Schertz v. Waupauca County*, 875 F.2d 578, 582

(7th Cir. 1989)("While Section 1983 claims presenting the question of probable cause are

generally inappropriate for disposition on summary judgment, this is true only where there is

room for a difference of opinion.").  The existence of probable cause for an arrest precludes a §

1983 claim for false arrest.  *Mark v. Furay*, 769 F.2d 1266, 1269 (7th Cir. 1985).

According to defendants, Chapieski had probable cause to believe that a homicide had

been committed while Rodgers had probable cause to believe that a child neglect or

endangerment crime had been committed.  An arrest is proper if an officer had probable cause

for  the arrest either for the offense cited or a closely related offense.  *Driebel v. City of

Milwaukee*, 298 F.3d 622, 644 (7th Cir. 2002).  Under the Illinois child endangerment law, "[i]t is

unlawful for any person to willfully cause or permit the life or health of a child under the age of

18 to be endangered or to willfully cause or permit a child to be placed in circumstances that

endanger the child's life or health."  720 ILCS 5/12-21.6.[11]  Further, 720 ILCS 130/2, child

neglect, states that any person who has custody of a child under 18 who "knowingly or wilfully

causes, aids or encourages such person to be or to become a dependent and neglected child" is

guilty of a Class A misdemeanor.  Finally, homicide and concealment of a homicide are

proscribed, 720 ILCS 5/9-1 and 3.1, as is battery to a child, 720 ILCS 5/12-4.3 ("Any person of

the age 18 years and upwards who intentionally or knowingly, and without legal justification and

_____

[11]The portion of this statute creating a rebuttable presumption that a person committed the
offense of child endangerment if he or she left a child 6 years of age or younger unattended in a
motor vehicle for more than 10 minutes was held unconstitutional.  *People v. Jordan*, No. 1-03-
2135, 2004 WL 2813179 (Ill. App. Ct. Dec. 8, 2004).  However, this section is inapplicable here.

by any means, causes great bodily harm or permanent disability or disfigurement to any child under the age of 13 years or to any severely or profoundly mentally retarded person, commits the offense of aggravated battery of a child.").

Defendants point to the following facts in support of their position that David had harmed his baby, concealed a homicide, or intentionally injured his baby: (1) the baby, who was distressed and suffering from physical complications, was not kept in an air-conditioned room despite the fact that it was a very hot day and the interior of the house was very hot; (2) the room where the baby was located was very hot and littered with open beer bottles; (3) the bed located in the room had blood and mucous stains on it; (4) the shirt the father had been wearing when the baby was sleeping on his chest did not have blood and mucous stains on it even though the baby was spitting up blood and mucous, (5) the father could not answer simple questions, such as where the baby was located, and when he did respond, "he was hesitant and paused and eventually changed his answers many times"; (6) the father was "eerily calm"; (7) the father seemed disinterested in the whereabouts of the baby; and (8) instead of asking about his baby, the father engaged in small talk and spoke about "sharpshooting pins," asked if his baby had suffered from SIDS and "complained" about the baby's feeding schedule and Down Syndrome. Further defendants state that David was not "acting in a manner which would be consistent with a distraught father" because he was "nonchalant" and was not in a hurry to get to the hospital. Finally, defendants state that the officers were aware of a similar case in which a poor investigation and a failure to separate the parents resulted in an inability to prosecute a homicide.

In response, plaintiffs argue that no credible evidence existed to support a showing of

probable cause as to any of the alleged offenses.[12]  Plaintiffs do not dispute that the bed had

blood and mucous stains on it but assert that defendants knew that blood and fluid stains are

often present at natural deaths.  Further, plaintiffs argue that defendants knew that CPR had been

performed on Claire and people often spit up during CPR.[13]  While plaintiffs contend that there is

no law requiring air-conditioning and that no evidence suggests that the Shemenskis had

consumed any alcohol on the night in question, plaintiffs do not dispute that the room was hot

and not air-conditioned or that there were beer bottles strewn around the room with cigarette

butts in them.  Plaintiffs contend, however, that Rodgers had acknowledged that David had

satisfactorily explained the presence of the beer bottles–that they had been in the room for

awhile and they had just not had the chance to clean them up.  Plaintiffs also point out that there

is no evidence that the plaintiffs had been drinking that night.  Plaintiffs also assert that David

was not wearing a shirt when he was sleeping with the baby; thus, he did not have blood and

mucous stains on his shirt because he put the shirt on later.

 Plaintiffs also challenge the defendants' characterization of David's behavior and

demeanor when the officers were questioning him.  Plaintiffs assert that David did answer the

questions posed to him and "candidly admitted that he was unsure about where exactly Claire

was when he was holding her."  Plaintiffs further dispute that David was "eerily calm."  Rather,

they state that David testified that he was merely attempting to remain calm in an effort to

---

[12]Plaintiffs spend a considerable portion of their argument on probable cause attempting to show that, as a matter of law, defendants' arrest of David was unreasonable and therefore unconstitutional.  However, Plaintiffs have not moved for summary judgment as to David's wrongful arrest claim.

[13]The record supports this statement for Rodgers, but not for Chapieski.

comfort and not to alarm his four other children.

Plaintiffs also contest the defendants' claim that David seemed disinterested in the whereabouts of Claire and that he was not anxious to get to the hospital. Plaintiffs note that David testified he had four other children at home and was waiting for a babysitter to arrive, and that when he was told that a sitter was on the way, he went to get dressed to go to the hospital. Indeed, David testified that when he did go outside to get in his car to go to the hospital, Chapieski's car was in the way and Chapieski told him he would have to wait a few minutes before he could move it so David asked the babysitter if he could borrow her car. Finally, plaintiffs contest defendants' assertion that instead of asking about the baby, David asked about Rodgers' sharpshooter pins, asked if the baby suffered from SIDS and "complained" about the baby's schedule. Plaintiffs state that David asked about the possibility of SIDS because Rodgers stated to David that he just completed a training class involving baby death and that the question about Rodger's sharpshooter pins was simply an effort to continue the small talk.

Plaintiffs have put forth evidence disputing the actual facts or, in most circumstances, the inferences to be drawn from the facts offered by defendants in support of their position that probable cause existed to arrest David Shemenski, whether it be for homicide, child endangerment or child neglect. Because it is clear from the record as discussed above that genuine issues of material fact exist with regard to the circumstances surrounding David Shemenski's arrest and whether probable cause existed for the arrest, summary judgment is inappropriate. *Vainder v. Powell*, No. 03 C 1509, 2004 WL 1660618, at * 7 (N.D. Ill. July 26, 2004) ("a determination by a court that probable cause existed as a matter of law is appropriate only 'when there is no room for difference of opinion concerning the facts or the reasonable

inferences to be drawn from them.'" (quoting *Sheikh-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994)).  Accordingly, the court denies defendants' motion for summary judgment as to the §1983 claim and the state false arrest claim.

**V.      Qualified Immunity**

Defendants also argue that the officers are shielded from liability for the § 1983 claim due to qualified immunity.  To determine whether the officers are entitled to qualified immunity, a court considers first whether the officer violated the plaintiff's constitutional rights, and second whether the particular right was clearly established at the time of the violation.  *Id.* (citing *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (other citation omitted)). "In the false arrest context, an officer is entitled to qualified immunity from suit if a reasonable officer in the defendant's position could have mistakenly believed that probable cause existed." *Id.*  This is also referred to as "arguable probable cause." *Id.*  However, given that the facts are in dispute as to the circumstances surrounding David's arrest, it is also inappropriate to decide at this time whether, as a matter of law, "arguable probable cause" existed.  Accordingly, the court denies defendants motion for summary judgment as to defendants' claim of qualified immunity.

**VI.     *Respondeat Superior* and Indemnification**

Defendants also seek summary judgment on plaintiffs' claims of *respondeat superior* and indemnification because these are derivative of plaintiffs' state law claims.  However, given that the court has denied summary judgment on the other claims, it cannot grant summary judgment to defendants on these claims.

**VII.    Conclusion**

For the foregoing reasons, defendants' motion for summary judgment is denied.

.

**ENTER:**                                    /s/ Blanche M. Manning

                                             **Blanche M. Manning**
                                             **United States District Judge**


**DATE:** April 13, 2005